**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| HAWK TECHNOLOGY SYSTEMS, LLC, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 2-20-cv-02766 |
| ) | |
| v.                                                    ) | Judge Jon Phipps McCalla |
| ) | |
| CASTLE RETAIL, LLC,                       ) | Magistrate Judge Tu M. Pham |
| ) | |
| Defendant.                          ) | |
| ) | |

## <u>MEMORANDUM BRIEF IN SUPPORT OF RULE 12(b)(6) MOTION TO DISMISS</u>

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................................1

II.     BACKGROUND .................................................................................................................4

III.    LEGAL STANDARDS ......................................................................................................5

IV.     ARGUMENT ......................................................................................................................6

     A.      The '091 Patent Claims Are Ineligible Under 35 U.S.C. § 101.............................6

          1.      The '091 Patent Claims Fail *Alice* Step One Because the Claims
              Are Directed to An Abstract Concept ...........................................................6

          2.      The '091 Patent Claims Fail *Alice* Step Two .............................................11

          3.      Each and Every Step of the Claims of the '091 Patent Involves
              Well-Understood, Routine, Conventional Activity .....................................15

     B.      Request for Costs and Attorneys' Fees ................................................................20

V.      CONCLUSION..................................................................................................................20

# I.    INTRODUCTION

This is precisely the type of case to which the Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014) squarely applies.  In *Alice*, the Supreme Court made clear that software patents that claim nothing more than an abstract idea are not directed to patent-eligible subject matter and, accordingly, should be held invalid under 35 U.S.C. § 101.  Here, the patent-in-suit claims nothing more than the abstract idea of collecting, analyzing, manipulating, and displaying data.  That is not patentable, and the use of a general purpose computer to implement the idea fails to supply the inventive concept necessary to transform this otherwise patent ineligible idea into something patentable.

In particular, the claims of the patent-in-suit, U.S. Patent No. 10,499,091 ("the '091 patent"), do not pass muster under either step of the Supreme Court's two-step test for patent eligibility under 35 U.S.C. § 101, as set forth in *Alice*.  The '091 patent contains six claims: claims 1 and 6 are independent claims, and claims 2-5 depend from claim 1.  All six claims purport to computerize nothing more than what video cameras have done for decades—video monitoring—and simply set forth abstract ideas using generic computer components and functionality.

Indeed, '091 patent claims merely present a straightforward description of conventional video surveillance systems, generically reciting the conventional steps of receiving video images at a computer system and digitizing, displaying, converting, and storing the images, followed by transmitting the images for remotely-displayed viewing upon request.  This functionality is achieved using a conventional "personal computer," an "analog-to-digital converter," a "storage device," a "communications link" and a "remote viewing device."  ('091 patent, claims 1 and 6).  Dependent claims 2-5 merely identify the timing of the remote viewing (claims 2 and 3), the use of the Internet for remote communication (claim 4) and the bandwidth of the broadband connection

(claim 5) and thus add nothing inventive.  Because all six claims of the '091 patent use generic computer components and functionality, they fail under both steps of the *Alice* test.

In applying *Alice's* two-step test for identifying ineligible patent claims, a court first determines whether the claims are directed to one of the patent-ineligible concepts—laws of nature, natural phenomena, or abstract ideas.  *Alice*, 134 S. Ct. at 2355 (citing *Mayo Collaborative v. Prometheus Labs*, 132 S. Ct. 1289, 1296–97 (2012)).  If the claims involve a patent-ineligible concept, a court next considers the elements of the claims, both individually and as an ordered combination, to determine whether those elements transform the concept into something that is a patent-eligible application.  *Id.* (citing *Mayo*, 132 S. Ct. at 1297–98).

Examining the claims of the '091 patent at *Alice* step one reveals that their "character as a whole" is directed to an abstract concept.  *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).  The steps in independent claims 1 and 6 of the '091 patent, for example, involve "receiving" video images at a personal computer based system, "digitizing" the images using an analog-to-digital converter, "displaying" the digitized images on a personal computer based display device, "converting" the images into a video format, contemporaneously "storing" the converted images in a storage device, "providing" a communications link for external viewing, "receiving" a remote request for streams of the video images, "transmitting" the video images to a remote viewing device, and "displaying" the video images on the remote device. Dependent claims 2-5 depend from claim 1 and, as discussed below, do not add anything inventive. As these highly generalized steps demonstrate, the claims of the '091 patent are directed to the patent-ineligible abstract concepts of "collecting, displaying, and manipulating data."  *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017).

Further confirming their abstract nature, the claims do not purport to improve the functionality of computers but instead use generic computer components as tools to carry out an abstract process. ('091 patent, claims 1-6.) The specification of the '091 patent likewise lacks any disclosure purporting to improve the functionality of any computing device. (*Id.* at col. 1-8.) The absence of meaningful technical detail in the claims or the specification describing how to achieve the claimed conversion of data from analog images into digital images or the claimed conversion of video images to a data storage format confirms that the claims are drawn from abstract ideas.

As for *Alice* step two, the elements of the claims of the '091 patent, viewed individually and as an ordered combination, provide no inventive concept. On the contrary, independent claims 1 and 6 recite generic steps and well-known components and/or features, such as a conventional "personal computer," an "analog-to-digital converter," a "viewing device" and a "storage device." Dependent claims 2-5 fail to add anything inventive as these claims simply recite conventional functions and/or features known in the art. For example, claims 2 and 3 merely recite the timing of remote viewing of a video stream as contemporaneous with (claim 2) or subsequent to (claim 3) live viewing and storage. Claims 4 and 5 simply add that the remote computing device and the network environment communicate through the Internet (claim 4) and that the broadband connection has a bandwidth of 2-6 Megabits per second (claim 5). Merely adding generic computer functions and features such as these is not enough to save these claims from abstraction. *See, e.g., Alice*, 134 S. Ct. at 2351.

The claims of the '091 patent do not disclose any unique arrangement of these conventional components and features, or any details regarding their operation. Instead, these components simply perform their basic functions and provide a generic computing environment in which the abstract concept is carried out. The claims of the '091 patent accordingly fail both steps of the

*Alice* test, and thus the claims are invalid under 35 U.S.C. § 101.  Dismissal with prejudice of this suit is therefore warranted for this reason.

## II.    BACKGROUND

The '091 patent is entitled "High-quality, reduced data rate streaming video production and monitoring system" and issued on December 3, 2019.  The '091 patent relates to viewing stored images from video cameras on a generic device.  ('091 patent, abstract.)  Thus, the idea at the heart of the '091 patent is the concept of storing digital information.  (*Id*. at claim 1.)

Claim 1 of the '091 patent recites:

1. A method of viewing, on a remote viewing device of a video surveillance system, multiple simultaneously displayed and stored video images, comprising the steps of:

**receiving** video images at a personal computer based system from a plurality of video sources, wherein each of the plurality of video sources comprises a camera of the video surveillance system;

**digitizing** any of the images not already in digital form using an analog-to-digital converter;

**displaying** one or more of the digitized images in separate windows on a personal computer based display device, using a first set of temporal and spatial parameters associated with each image in each window;

**converting** one or more of the video source images into a selected video format in a particular resolution, using a second set of temporal and spatial parameters associated with each image;

contemporaneously **storing** at least a subset of the converted images in a storage device in a network environment;

**providing** a communications link to allow an external viewing device to access the storage device;

**receiving**, from a remote viewing device remoted located remotely from the video surveillance system, a request to receive one or more specific streams of the video images;

**transmitting**, either directly from one or more of the plurality of video sources or from the storage device over the communication link to the remote viewing device, and in the selected video format in the particular resolution, the selected video format being a progressive video format which has a frame rate of less than substantially 24 frames per second using a third set of temporal and spatial parameters associated with each image, a version or versions of one or more of the video images to the remote viewing device, wherein the communication link traverses an external broadband connection between the remote computing device and the network environment; and

> **displaying** only the one or more requested specific streams of the video images on the remote computing device.

(*Id.* (emphasis added).)  In other words, claim 1 merely recites using a conventional "personal computer," an "analog-to-digital converter," a "storage device," a "communications link" and a "remote viewing device" to collect, analyze, manipulate, and store information.  The other independent claim 6 differs from claim 1 only by adding the recitation of "traversing the Internet" and deleting the recitation of "wherein the communication link traverses an external broadband connection between the remote computing device and the network environment."  (*Id.*, claim 6).  Claim 6 thus recites nothing more meaningful than claim 1.

Likewise, dependent claims 2-5 of the '091 patent, all of which depend from claim 1, do not meaningfully add to or limit the scope of the '091 patent claims.  Each dependent claim is directed to merely (a) identifying the timing of the remote viewing (claims 2 and 3), (b) using the Internet for remote communication (claim 4), and (c) reciting the bandwidth of the broadband connection (claim 5).  Thus, these claims add nothing inventive but rather invoke an abstract idea without adding any inventive concept.  They recite no details on the manner in which the recited conventional technologies are used, other than according to their ordinary functions, and disclose no additional features sufficient to transform this abstract idea into a patent-eligible application.

## III.   LEGAL STANDARDS

Patent eligibility under § 101 is a question of law suitable for resolution on a motion to dismiss.  *Oip Techs.,* Inc. *v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1345 (Fed. Cir. 2014), cert. denied, 136 S. Ct. 119 (2015) (affirming finding of ineligibility made on 12(b)(6) motion); *Network Apparel Grp., LP v. Airwave Networks Inc.*, No. 6:15-CV-00134, 2016 WL 4718428, at *2 (W.D. Tex. Mar. 30, 2016), aff'd, 680 F. App'x 1003 (Fed. Cir. 2017) (granting

12(b)(6) motion to dismiss on grounds that the patent at issue is invalid under 35 U.S.C. § 101); *MacroPoint, LLC v. FourKites, Inc.*, No. 1:15 CV 1002, 2015 U.S. Dist. LEXIS 151045, at *20 (N.D. Ohio Nov. 6, 2015) (granting motion to dismiss on § 101 grounds). In ruling on a motion to dismiss, the court "must take all of the factual allegations in the complaint as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions…." *Id.* at 667 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## IV.    ARGUMENT

### A.    The '091 Patent Claims Are Ineligible Under 35 U.S.C. § 101

#### 1.    The '091 Patent Claims Fail *Alice* Step One Because the Claims Are Directed to An Abstract Concept

Step one of the *Alice* two-step test requires an examination of claims to determine whether their "focus" or "character as a whole" is directed to excluded subject matter. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); *Alice*, 134 S. Ct. at 2355-56. The goal of this step is to identify the basic concept at the "heart" of the claims. *See Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d at 714–15 (Fed. Cir. 2014) (abstract idea at the "heart" of eleven-step claim was using advertising as an exchange or currency). As discussed below, the claims of the '091 patent fail step one of the *Alice* test.

Indeed, examining independent claims 1 and 6 of the '091 patent confirms that they merely present a straightforward description of conventional video surveillance systems, accompanied by a generic recitation of the conventional steps of "receiving" video images at a personal computer based system, "digitizing" the images using an analog-to-digital converter, "displaying" the digitized images on a personal computer based display device, "converting" the images into a video format, contemporaneously "storing" the converted images in a storage device, "providing"

a communications link for external viewing, "receiving" a remote request for streams of the video images, "transmitting" the video images to a remote viewing device, and "displaying" the video images on the remote device.  ('091 patent at claims 1, 6.)  Stripped of their excess verbiage, the '091 patent claims therefore fall into the "familiar class of claims" that the Federal Circuit has repeatedly held as directed to the patent-ineligible abstract concepts of collecting information, analyzing it, displaying certain results, and storing them.  *Elec. Power Grp.*, 830 F.3d at 1354 ("[A] process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions . . . [is] directed to an abstract idea.").  Performing the claimed steps by using the conventional functionality of a computer and communications system does not make the process any less abstract.  *See Ultramercial*, 772 F.3d at 717 ("Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis.").

The Federal Circuit's opinion in *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 850 F.3d 1332 (Fed. Cir. 2017), is particularly applicable here in that it involved an abstract concept very similar to that claimed in the '091 patent and is illustrative of the Federal Circuit's pervasive line of authority.  In *Intellectual Ventures I*, the representative claim was to an "apparatus for manipulating XML documents."  *Id*. at 1339.  The claim elements included (1) a processor, (2) a component that organizes data components of one or more XML documents into data objects, (3) a component that identifies a plurality of primary record types for the XML documents, (4) a component that maps the data components of each data object to one of the plurality of primary record types, (5) a component that organizes the instances of the plurality of primary record types into a hierarchy to form a management record type, (6) a component that defines a dynamic

document for display of an instances of a management record type through a user interface, and (7) a component that detects modification of the data in the dynamic document via the user interface, and in response thereto modifies a data component in an XML document. *Id.*

Despite the prolixity of the claim language, the Federal Circuit in *Intellectual Ventures I* held that the claims were directed to the abstract idea of "collecting, displaying, and manipulating data." 850 F.3d at 1340. The Court analogized the claims to other ineligible claims reciting similar data manipulation steps, such as those in *Content Extraction*, 776 F.3d at 1347, *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1347 (Fed. Cir. 2015), and *Electric Power Group*, 830 F.3d at 1353–54. *Id*. For instance, the Court noted that the analogous patent claims in *Content Extraction* involved "extracting data from a document, entering the data into appropriate data fields, and storing data in memory," and thus were directed to the abstract concept of "'1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory.'" *Id*. (quoting *Content Extraction*, 776 F.3d at 1347). The Court also highlighted similarities to the ineligible subject matter in *Capital One Bank*, which involved "customizing information and presenting it to users based on particular characteristics." *Id*. (citing *Capital One Bank*, 792 F.3d at 1370). And the Court pointed to the comparably abstract claims in *Electric Power Group*, which were directed to "collection, manipulation, and display of data." *Id*. (citing *Elec. Power Grp.*, 830 F.3d at 1353–54).

The additional content of dependent claims 2-5 of the '091 patent, which depend from claim 1, merely adds one or more conventional functions and/or features known in the art and therefore does not save the claims from abstraction but rather simply confirms that the claims are focused on patent ineligible concepts. Indeed, the additional recitations regarding the timing of remote viewing of a video stream as contemporaneous with (claim 2) or subsequent to (claim 3)

live viewing and storage provide nothing inventive.  Similarly, reciting that the remote computing device and the network environment communicate through the Internet (claim 4) and that the broadband connection has a bandwidth of 2-6 Megabits per second (claim 5) is, again, insufficient to save the claims from abstraction.  *See, e.g.*, *Alice*, 134 S. Ct. at 2351; s*ee also Ultramercial*, 772 F.3d at 716 ("[T]he use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101.").

Again particularly relevant here, the Federal Circuit in *Intellectual Ventures I* rejected the patentee's argument that the claimed subject matter was not abstract because it "relates to a specialized computer language – XML – and renders otherwise incompatible documents compatible through a unique dynamic document" based on data structures recited by the claims. 850 F.3d at 1341.  In other words, just like the claims of the '091 patent, which involve digitization of analog images using an analog-to-digital converter, the patent in *Intellectual Ventures I* involved the manipulation of data to render otherwise incompatible information compatible.  This was not enough to save the claims from abstraction because "the underlying concept embodied by the limitations merely encompasses the abstract idea itself of organizing, displaying, and manipulating data of particular documents."  *Id.*

Thus, as in *Intellectual Ventures I* and the litany of analogous Federal Circuit decisions it cites, the claims of the '091 patent are directed to an abstract concept: collecting, manipulating, displaying, and storing information.  *See also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) (holding claims to classifying and storing digital images in an organized manner to be abstract); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) (finding that "a process of organizing information through mathematical correlations" is an abstract idea); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366,

1375 (Fed. Cir. 2011) (finding claimed process to "manipulate[ ] data to organize it in a logical way" was not sufficiently transformative to state a patent eligible invention).

Furthermore, to the extent that the claims of the '091 patent purport to describe an advance, which in reality they do not, the '091 patent claims do not set forth any particular inventive technology for performing any of the functions specified in the claims.  Claims 1 and 6 the '091 patent generally describe using "temporal and spatial parameters."  Neither claim 1 nor claim 6, however, explains or limits how any computer would be programmed or provides any other meaningful technical detail for accomplishing displaying or converting functions using "temporal and spatial parameters."  *Intellectual Ventures I*, 850 F.3d at 1340; *Digitech Image Techs.*, 758 F.3d at 1350.

The specification of the '091 patent likewise does not provide any details (*e.g.*, any algorithm), and it instead simply provides generic descriptions.  ('091 patent at col. 1-8.)  Indeed, in the '091 patent, there is no mention of any "temporal and spatial parameters" in the specification. (*Id.*)  In fact, the '091 patent does not even mention the words "temporal," "spatial" or "parameters" anywhere in the specification.  (*Id.*)  In short, "[t]he specification fails to provide any technical details for the tangible components, [and] instead predominantly describes the system and methods in purely functional terms," a telltale sign that the '091 patent claims are abstract. *TLI Commc'ns,* 823 F.3d at 612.

At bottom, the claims of the '091 patent recite the same type of subject matter that routinely has been held to reflect an abstract idea and therefore fail under *Alice* step one.  *See, e.g.*, *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329 (Fed. Cir. 2017) (claims directed to sending information, directing the sent information, monitoring receipt of the sent information, and accumulating records about receipt of the sent information); *Move, Inc. v. Real*

*Estate Alliance Ltd.*, 721 F. App'x 950, 954 (Fed. Cir. 2018) (non-precedential) (claims directed to "a method for collecting and organizing information about available real estate properties and displaying this information on a digital map that can be manipulated by the user."); *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018) (claims directed to calculating, analyzing, and displaying investment data); *Univ. of Fla. Research Found., Inc. v. GE Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2019) (claims directed to "collecting, analyzing, manipulating, and displaying data."); *WhitServe LLC v. Donuts Inc.,* 809 F. App'x 929, 931 (Fed. Cir. 2020) (claims directed to computers and a network as a tool to carry out information exchange).

### 2.    The '091 Patent Claims Fail *Alice* Step Two

In applying *Alice* step two, a court looks at the elements of each claim "both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297–98). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* at 2357 (quoting *Mayo*, 132 S. Ct. at 1297). "[S]imply appending conventional steps, specified at a high level of generality, to … abstract ideas cannot make those … ideas patentable." *Mayo*, 132 S. Ct. at 1300. In addition, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Alice*, 134 S. Ct. at 2358 (quoting *Bilski v. Kappos*, 561 U.S. 593, 610–11 (2010)); *see also Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d at 1259 (Fed. Cir. 2016) ("[M]erely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claim any less abstract.").

The conventional components of the '091 patent claims provide no inventive concept. A "personal computer," an "analog-to-digital converter," a "storage device," a "communications

link" and a "remote viewing device" of the claims behave as expected, performing "well-understood, routine conventional activit[ies]" to implement the underlying abstract idea. *Mayo*, 132 S. Ct. at 1298. The '091 patent freely admits this, stating that the claims employ "conventional broadband channels" and "use [] a generic PC-based server [which] can easily handle a large monitoring application." ('091 patent at 2:15–20 and 5:44-45.) This generic computer implementation simply is not enough to transform a patent-ineligible abstract idea into a patent-eligible invention. *See, e.g.*, *Alice*, 134 S. Ct. at 2360 (finding a "data processing system" to be purely functional and generic); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x at 1008–09 (Fed. Cir. 2014) (finding a "computer with a central processing unit," a "memory," an "input and output terminal," and a "printer" to be merely generic); *DirecTV*, 838 F.3d at 1263 (finding claims invalid that "simply recite[ ] that the abstract idea of remote delivery will be implemented using the conventional components and functions generic to cellular telephones.") Because the elements of the '091 patent claims "simply provide the environment in which the abstract idea…is carried out," they provide no inventive concept. *TLI Commc'ns*, 823 F.3d at 614.

Additionally, converting video source images into a data storage format provides no inventive concept either because "[it] merely describe[s] the functions of the abstract idea itself, without particularity." *Intellectual Ventures I*, 850 F.3d at 1341; *see also, Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1242 (Fed. Cir. 2016) (finding claimed software to be non-inventive, noting that "difficulty of the programming details for this functionality is immaterial because these details are not recited in the actual claims."); *Planet Bingo*, 576 F. App'x at 1008–09 ("program…enabling" the steps of managing a game of bingo recited generic computer implementation of abstract idea). "This is simply not enough under step two" of *Alice*. *Intellectual Ventures I*, 850 F.3d at 1341; *see also Alice*, 134 S. Ct. at 2359 (holding claims to be patent

ineligible where "each step does no more than require a generic computer to perform generic computer functions") (internal quotation marks, citation omitted); *Ultramercial*, 772 F.3d at 716 ("Adding routine[,] additional steps … does not transform an otherwise abstract idea into patent-eligible subject matter."); *Bancorp Servs., LLC v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d at 1278 (Fed. Cir. 2012) (appending generic computer components does not "salvage an otherwise patent-ineligible process").   Indeed, the underlying concept embodied by that claim element "merely encompasses the abstract idea itself" of receiving, manipulating, and displaying information. *Intellectual Ventures I*, 850 F.3d at 1341.

Examining dependent claims 2-5 of the '091 patent reinforces that there is no inventive concept here.  That is, merely adding conventional functions and/or features known in the art does not render the claims non-abstract.   For example, adding a step of viewing a given video contemporaneous with live viewing (claim 2) or subsequent to live viewing and storage (claim 3) fails *Alice* step two at least because "[it] merely describe[s] the functions of the abstract idea itself, without particularity." *Intellectual Ventures I*, 850 F.3d at 1341.  Similarly, adding that the remote computing device and the network environment communicate through the Internet (claim 4) and that the broadband connection has a bandwidth of 2-6 Megabits per second (claim 5) is routine and well-understood in the art. *Ultramercial*, 772 F.3d at 716 ("[T]he use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101.").

Indeed, the law is clear that merely adding generic computer functions and features such as these is not enough to save the claims of the '091 patent from abstraction. *See, e.g.*, *Alice*, 134 S. Ct. at 2351 (invalidating claims under § 101 where "the system claims recite a handful of generic computer components configured to implement the same idea" as method claims).  When viewed individually or collectively, the underlying concept embodied by these claim elements "merely

encompasses the abstract idea itself of organizing, displaying, and manipulating data." *Intellectual Ventures I*, 850 F.3d at 1341.  None of these elements, viewed individually or collectively, "offers a meaningful limitation beyond generally linking the use of the [method] to a particular technological environment, that is, implementation via computers."  *Alice*, 134 S. Ct. at 2360 (internal quotations and citations omitted).

Moreover, considering the '091 patent claim elements as an ordered combination does not alter the conclusion at *Alice* step two.  Just as in *Intellectual Ventures I*, the claims of the '091 patent recite generic computer elements—a personal computer, an analog-to-digital converter, a storage device, a communications link and a remote viewing device—"and a series of generic computer 'components' that merely restate their individual functions."  850 F.3d at 1341; *see also WhitServe LLC,* 809 F. App'x at 934 (finding that "generic computer and communications components provide no eligibility-transformative inventive concept" and explaining that "the specific ordered combination of these generic components is likewise insufficient, as it does nothing more than spell out what it means to apply [the abstract idea] on a computer) (internal quotations and citations omitted).  Thus, the claim elements "merely describe the functions of the abstract idea itself, without particularity," thereby providing no inventive concept.  850 F.3d at 1341.  And while the '091 patent purports to have met a need in the art to implement an automated video monitoring system using a personal computer, an analog-to-digital converter, a storage device, a communications link and a remote viewing device, "[n]othing in the claims indicate what steps are undertaken to overcome the stated incompatibility problems…."  *Intellectual Ventures I*, 850 F.3d at 1342.  As in *Intellectual Ventures I*, "the claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it."  *Id*.  "Our law

demands more." *Id.* (citing *Elec. Power Grp.*, 830 F.3d at 1356 (cautioning against claims "so result focused, so functional, as to effectively cover any solution to an identified problem")).

In sum, the '091 patent merely incorporates pre-existing industry standards and generic devices, computers, and/or processing systems. Notably, as discussed further *infra* in § A.3, each and every step of the '091 patent claims is conventional and each claim element—either individually or as an ordered combination—does not transform the abstract idea into a patent-eligible application. Even if some steps in the claims "were not previously employed in this art," which they all were, this "is not enough—standing alone—to confer patent eligibility upon the claims at issue." *Ultramerical*, 772 F.3d at 716.

### 3. Each and Every Step of the Claims of the '091 Patent Involves Well-Understood, Routine, Conventional Activity

The prior art that was available to the public years before the earliest priority date of the '091 patent confirms that the steps in the '091 patent claims merely involve "well-understood, routine, conventional activity." *Mayo*, 132 S.Ct. at 1294. Thus, "upholding the patent[] would risk disproportionately tying up the use of the underlying" conventional steps. *Id.* For example, as discussed below, U.S. Patent No. 5,375,068 to Palmer et al. ("Palmer;" Exhibit A), which issued on December 20, 1994, discloses, expressly or inherently, all of the '091 patent claim elements.

Palmer generally discloses a method and apparatus for video teleconferencing. Palmer at Abstract. More specifically, Palmer discloses what the claims of the '091 patent recite as "receiving video images at a personal computer based system from a plurality of video sources." For example, Palmer discloses a "[m]ultimedia workstation 12 [that] includes a color video frame grabber 34 for capturing and digitizing frames of video from one or more analog video inputs 36." *Id.* at 6:8–10. According to Palmer, "Video inputs 36 are each connected to a video source, such as a video camera 38 providing live analog video signals." *Id.* at 6:10–16.

-15-

Palmer also discloses what the '091 patent claims recite as "digitizing any of the images not already in digital form using an analog-to-digital converter."  For example, Palmer discloses a "video frame grabber [that] captures, digitizes, and stores each frame of analog video."  *Id*. at 3:41–42.  Palmer explains that "the flow of video from one workstation to another" begins with the video data source providing "standard NTSC, SECAM, or PAL analog video signals 200 which are digitized and stored in a video frame buffer 35 by the frame grabber 34."  *Id*. at 10:33–38.

Palmer further discloses what the claims of the '091 patent recite as "displaying one or more of the digitized images in separate windows on a personal computer based display device, using a first set of temporal and spatial parameters associated with each image in each window."  For instance, Palmer discloses that "the size of the video window [ ] can be changed by using the mouse to move a side or corner of the window."  *Id*. at 17:48–50.  Palmer also discloses that it is possible to "adjust various parameters associated with the audio and video data," and "the user can adjust transmission parameters including the maximum video frames per second."  *Id*. at 18:48–49, 54–56.  Thus, Palmer discloses that each window may have a set of temporal (i.e., "video frame rate") and spatial (i.e., "number of pixels") parameters associated with it.

Palmer additionally discloses what the claims of the '091 patent recite as "converting one or more of the video source images into a selected video format in a particular resolution, using a second set of temporal and spatial parameters associated with each image."  For example, Palmer discloses various data storage formats including "[s]tandard compression methods such as JPEG (Joint Photographic Experts Group), MPEG (Motion Picture Experts Group) and Px64."  *Id*. at 7:26–30.  Palmer explains that "a 'control' pushbutton can be added to the DECspind session window, which when activated offers the user a limited control set for adjusting the received video image or audible levels."  *Id*. at 18:11–14.  According to Palmer, "[t]he user can also create and

store an audio/video 'filmclip' file through [a call list] pop-up window." *Id*. at 18:43–44.  In particular, the call list window described in Palmer includes "[a]n output file 'connect' toggle pushbutton," which allows the user to store the audio and video to the output file. *Id*. at 20:15–20. Further, as the videos transmitted from other workstations may have different temporal and spatial parameters, it is inherent in Palmer that the exported film clip may use what the claims of the '091 patent recite as "using a second set of temporal and spatial parameters associated with each image."

Palmer further discloses what the claims of the '091 patent recite as "contemporaneously storing at least a subset of the converted images in a storage device in a network environment"; "providing a communications link to allow an external viewing device to access the storage device"; "receiving, from a remote viewing device remoted located remotely from the video surveillance system, a request to receive one or more specific streams of the video images"; and "transmitting … a version or versions of one or more of the video images to the remote viewing device."  As discussed above, Palmer discloses various data storage formats including "[s]tandard compression methods such as JPEG (Joint Photographic Experts Group), MPEG (Motion Picture Experts Group) and Px64." *Id*. at 7:26–30.  Palmer also discloses that "[t]he DTP video teleconferencing protocol of this invention is used to transfer audio and video data between workstations, as well as between local applications (loopback), and for storing and retrieving audio and video data to and from a disk file." *Id.* at 7:55-59.

Palmer additionally discloses what the claims of the '091 patent recite as "displaying only the one or more requested specific streams of the video images on the remote computing device," as discussed above. *Id.* at 17:48–50; 18:48–49, 54–56.  In other words, every step of the '091 patent claims is either expressly or inherently disclosed in Palmer.  Palmer accordingly provides independent evidence that every element of the claims of the '091 patent is conventional and that

the claims of the '091 patent are invalid under 35 U.S.C. § 101.  As further discussed below, however, Palmer is not the only prior art that discloses the elements of the '091 patent claims.

For example, U.S. Patent No. 5,625,410 to Washino[1] et al. ("Washino;" Exhibit B), which issued on April 29, 1997, discloses the claimed subject matter of the '091 patent.  Washino generally discloses a method and apparatus for video teleconferencing.  Washino purports to implement an automated video monitoring system by way of a PC-based platform employing display windowing software, with camera sources being interfaced to an input circuit board that includes provisions for image data compression.  Washino at 2:64-67 and 3:1.  In particular, Washino discloses a "more efficient method for monitoring camera outputs by means of a multiple-window display system implemented on a computer platform" and "provide[s] a system for remote monitoring of cameras by means of transmission of data-compressed digital images over communication links."  *Id.* at 3:53-65 and 4:1-4.

Like the '091 patent, Washino discloses and claims a video storage and display system and a method of using same.  For example, claim 1 of Washino recites:

1. A video storage and display system, comprising:
a plurality of video cameras, each outputting a signal representative of a video image;
means to receive the signals from each camera and digitally compress the images;
two forms of high-capacity storage media, one being randomly searchable while the other continues to store the digitally compressed image; and
a computer configured to receive the digitally compressed images, the computer being interfaced to the following devices:
a display screen,
means to receive externally derived operator commands, and
the high-capacity storage media, and wherein the computer is programmed to perform the following functions:

---

[1] The two named inventors on the Washino patent are the same two named inventors on the '091 patent.

display the digitally compressed images from the cameras in different windows on the display screen, each window being associated with an update rate and dimensions in pixels,

vary the dimensions and the rate at which a particular image is updated in its window in accordance with one of the externally derived commands,

store the digitally compressed images in the high-capacity storage medium, and

vary the dimensions and the rate at which a particular image is stored in accordance with one of the externally derived commands.

*Id.* at 11:5-35.  Then, claim 12 of Washino teaches:

12.    The method of simultaneously displaying and storing multiple video images, comprising the steps of:

*receiving* video images from a plurality of sources;

*digitizing* one or more of the images if not already in digital form;

*displaying* at least certain of the digitized images in separate windows on a display device, using a first set of temporal and spatial parameters associated with each image in each window;

*simultaneously storing* the displayed images using a second set of *temporal and spatial parameters* associated with each image.

*Id.* at 12:16-28 (emphasis added).

Stripped of their excess verbiage, the claims of the '091 patent, like Washino's claims 1 and 12, recite, *inter alia*, "receiving video images," "digitizing any of the image not already in digital form," displaying the digitized images, converting the video sources images into a data storage format, and simultaneously storing the converted images in a storage device.  Therefore, the claims of the '091 patent not only recite conventional subject matter but also fall squarely within the scope of the inventors' own prior art Washino patent.

Thus, the claims of the '091 patent, as demonstrated by the above prior art patents merely claim conventional steps and elements without "transform[ing] the nature of the claim into a patent-eligible application."  *Alice*, 134 S. Ct. at 2355.  As discussed above, the "inventive concept" of *Alice* step two requires "significantly more" than the abstract idea itself.  *See id.* at 2358; *see also First-Class Monitoring, LLC v. Ups of Am., Inc.*, 389 F. Supp. 3d 456, 471 (E.D.

Tex. 2019) (A plaintiff cannot "avoid dismissal simply by reciting in the complaint that the invention at issue is novel and that the inventive concept resides in the abstract idea itself."). For at least these additional reasons, the claims of the '091 patent fail *Alice*'s second prong.

### B.    Request for Costs and Attorneys' Fees

The Court possesses the inherent power to award costs and attorneys' fees for litigation misconduct.  An award of attorneys' fees is proper where, for example, "a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 752 (6th Cir. 2010) (quotations omitted).  This lawsuit is objectively baseless, thus warranting an award of costs and fees against Plaintiff, because no reasonable litigant could expect success on the merits, especially when all claims of the '091 patent are invalid under 35 U.S.C. § 101 for failure to satisfy steps one and two of the Supreme Court's *Alice* test.[2]

## V.    CONCLUSION

For at least the reasons discussed above, the Court should dismiss Plaintiff's Complaint with prejudice, pursuant to F.R.C.P. 12(b)(6), and award costs and fees to Castle Retail, LLC.

Dated: December 23, 2020                    Respectfully Submitted,

                                            /s/R. Mark Field
Justin J. Hasford                           R. Mark Field       Tenn. BPR No. 010439
Finnegan, Henderson,                        Evans Petree PC
Farabow, Garrett & Dunner, LLP              1715 Aaron Brenner Drive, Suite 800
901 New York Avenue, NW                     Memphis, TN  38120
Washington, DC 20001-4413                   (901) 474-6112
(202) 408-4000                              rfield@evanspetree.com
justin.hasford@finnegan.com

                                            *Attorneys for Castle Retail, LLC*

---

[2] To the extent the Court prefers any request for costs and attorneys' fees to be filed as a separate motion, Castle Retail, LLC shall do so.

## <u>CERTIFICATE OF SERVICE</u>

I, R. Mark Field, do hereby certify that I have electronically filed the foregoing with the

Clerk of Court using the ECF system which sent notification of such filing to the following:

> Mr. Frank J. Dantone
> Henderson Dantone
> 241 Main Street (38701)
> P.O. Box 778
> Greenville, MS  38702
> Email:  fjd@hdpa.com
> <u>Attorney for Hawk Technology Systems, LLC</u>

on the 23rd day of December, 2020.

> /s/R. Mark Field
> R. Mark Field